Adebiyi **ADEYINKA,** Plaintiff,

v.

**YANKEE FIBER CONTROL, INC., and Aqua–Dyne, Inc., Defendants.**

No. 05 Civ. 751(RJS).

United States District Court, S.D. New York.

July 8, 2008.

Joshua Brian Irwin, Esq., and Gregory J. Cannata, Esq., New York, NY, for Plaintiff.

Thomas Francis Cerussi, Esq., William R. Fried, Esq., and Patrick Riggs, Esq., Cerussi & Spring, White Plains, NY, Christian D. Lofaro, Esq., Marshall Dennehey Warner Coleman & Goggin, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiff Adebiyi Adeyinka brings this diversity action against Yankee Fiber Control, Inc. ("Yankee Fiber"), and Aqua–Dyne, Inc. ("Aqua Dyne"), seeking damages under New York law for injuries he allegedly sustained while using a product manufactured by Aqua–Dyne and leased to his employer by Yankee Fiber. Specifically, Adeyinka asserts claims under New York law for strict products liability, failure to warn, negligence, failure to train and negligent entrustment. Yankee Fiber and Aqua Dyne have also asserted cross-claims against one another for contribution and indemnification.

Yankee Fiber now moves for summary judgment against plaintiff's claims and Aqua Dyne's cross-claims. For the following reasons, Yankee Fiber's motion is granted as to plaintiff's negligent entrustment claim and Aqua Dyne's cross-claim for contractual indemnification. Yankee Fiber's motion is denied as to plaintiff's and Aqua Dyne's remaining claims.

### I. BACKGROUND

#### A. The Facts

The Court has taken the facts described below from the parties' respective Local Rule 56.1 statements of facts as well as the

deposition transcripts and declarations submitted by the parties.[1] Upon consideration of a motion for summary judgment, the Court construes these facts in the light most favorable to plaintiff and Aqua Dyne, the non-moving parties. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir.2005).

### 1. The Parties

At all relevant times, Adeyinka worked as a lead abatement worker for the New York City Housing Authority ("NYCHA"). (*Id.* ¶ 2.) Yankee Fiber is a privately owned asbestos and lead abatement company. (Yankee Fiber's 56.1 Stmt. ("Yankee Fiber's 56.1") ¶ 1.) James Hutzler is the President and sole owner of Yankee Fiber, and manages the day to day operations of the company. (*Id.* ¶ 25; Hutzler Supp. Aff. ¶ 1.) Aqua Dyne manufactures high pressure water-jet equipment, including the device that allegedly caused Adeyinka's injuries. George Rankin is the President of Aqua Dyne. (Yankee Fiber's 56.1 ¶ 25.) Yankee Fiber leased the device to NYCHA. (*Id.* ¶ 29.)

### 2. The Water Jet

The device at the center of this litigation is an "ultra high pressure water jetting system" (the "water jet"), which is used to remove paint or grease from various surfaces. (Yankee Fiber's 56.1 ¶ 24; *see* Rankin Tr. at 20–21.[2]) The water jet is made up of several distinct components. One of these is known as the "mini scrubber," and is a hand-held attachment that is applied to the cleaning surface. The mini scrubber is attached to two additional components—the "ultra high pressure pump" and the vacuum pump. (*See* Hutzler Tr. at 93.) The ultra high pressure pump pressurizes water that flows through the mini-scrubber. The vacuum pump generates vacuum power to maintain suction in the mini-scrubber and to pull waste water back through the device. (*See* Hutzler Tr. at 93.) The water jet is intended to be run by three individuals: one person operates the mini-scrubber while two other individuals operate the controls that adjust the levels of water and vacuum pressure in the device.

---

**1.** Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no admissible evidence to controvert that fact. The Court notes that plaintiff and Aqua–Dyne have failed to comply with Local Civil Rule 56.1(b), which provides that "papers opposing a motion for summary judgment shall include a ... numbered paragraph responding to each numbered paragraph in the statement of the moving party." Instead, plaintiff has submitted a statement of facts that responds to only a few of the numbered paragraphs in Yankee Fiber's statement; Aqua–Dyne has submitted a "Counter–Statement of Facts," which, rather than responding to the numbered paragraphs in Yankee Fiber's statement of facts, presents its own version of the facts as to which Aqua–Dyne contends there is no genuine issue to be tried. Nevertheless, a district court has "broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefel-*

*ler & Co.*, 258 F.3d 62, 73 (2d Cir.2001) (internal citations omitted). Here, although plaintiff and Áqua–Dyne did not fully comply with Rule 56.1, their 56.1 statements include citations to the relevant portions of the record that purportedly support their versions of the facts. Thus, the moving party and the Court are clearly aware of the portions of the record upon which plaintiff and Aqua–Dyne rely in opposing Yankee Fiber's motion, and Yankee Fiber has not identified any prejudice arising from plaintiff's or Aqua–Dyne's failures to comply with Rule 56.1. Accordingly, in the exercise of its broad discretion, the Court has fully considered the materials offered by plaintiff and Aqua–Dyne in support of their opposition to Yankee Fiber's motion.

**2.** Hereinafter, "Tr." refers to the transcript of the deposition testimony of the witness in question.

In order to remove paint or grease from a surface, the operator of the water jet holds the mini-scrubber by its two handles and pushes it against the cleaning surface. (*See* Yankee Fiber's 56.1 ¶ 7; Mallinson Tr. at 106.) The mini-scrubber is held to the surface by vacuum pressure. (*See* Rankin Tr. at 57.) Once the mini-scrubber is placed against the wall and secured in place by vacuum pressure, the operator squeezes both of its handles simultaneously to trigger the release of pressurized water from the mini-scrubber's nozzles. (*Id.* at 58.) The pressurized water emitted from the water jet strips the paint or grease from the surface, and the waste water is then vacuumed back into the mini-scrubber for storage in the water jet.

The vacuum pressure in the water jet is intended to be sufficiently strong so as to "keep[ ] the mini-scrubber on the wall, even without the operator holding it to the wall" (*see* Rankin Tr. at 57), and even as pressurized water is being released from the device (*id.*). However, the vacuum pressure only holds the mini-scrubber against a surface if the miniscrubber is actually in contact with that surface. (Rankin Tr. at 62.)

### 3. Yankee Fiber's Purchase of the Water Jet

Yankee Fiber purchased the water jet at issue in this case from Aqua Dyne in June or July 2002 for $64,795. (Yankee Fiber's 56.1 ¶ 24; Pl.'s 56.1 Stmt. Ex. 1.) However, the water jet used by Adeyinka included a vacuum pump that was *not* purchased from Aqua Dyne but, rather, was purchased separately and brought to the work site by Yankee Fiber. (*See* Mallinson Tr. at 40–41.)

Plaintiff and Aqua Dyne point out that "Yankee Leasing Corporation" (hereinafter, "Yankee Leasing"), and *not* Yankee Fiber, is listed as the purchaser of the water jet on the original purchase invoice. (*See* Christman Aff. Ex. I.) Yankee Leasing Corporation is not a party to this action. According to Hutzler, who is also the President and sole owner of Yankee Leasing, the company purchased the water jet from Aqua Dyne and then leased the device to Yankee Fiber, which, in turn, leased the water jet to NYCHA. (Hutzler Supp. Aff. ¶¶ 2, 5.) Hutzler describes Yankee Leasing as a "nonparty corporation in the business of acquiring equipment and leasing/renting of same only to Yankee Fiber," and asserts that it has "never" leased "any equipment to any other person and/or entity except Yankee Fiber." (Hutzler Supp. Aff. ¶ 4.) Plaintiff and Aqua Dyne have failed to present any evidence indicating that Yankee Leasing rented the water jet, or any other product, to entities other than Yankee Fiber.

### 4. Yankee Fiber's Lease of the Water Jet to NYCHA

In 2001, NYCHA first approached Yankee Fiber regarding a lease of the water jet.[3] (*See* Hutzler Tr. at 92; *see also* Yankee Fiber's 56.1 ¶ 40–41.) According to Hutzler, during his first meeting with NYCHA's representative, Raf Fletcher, Hutzler warned Fletcher that the water jet was "not a machine that anyone can pick up[,] it requires training." (Hutzler Tr. at 92.) Hutzler asserts that Fletcher then indicated that NYCHA already had em-

---

**3.** In their submissions to this Court, the parties—in particular, Yankee Fiber—appear to use the words "rent" and "lease" interchangeably. Indeed, based on the parties' usage of the two terms, it is clear that they do not accord any significance to the differences, if any, between the substantive meanings of the two terms. Therefore, for the purposes of this decision, the Court views the terms as indistinguishable. For convenience's sake and because the term appears more frequently in the relevant case law, the Court will use the term "lease" throughout this decision.

ployees that had "performed this work" and were "very heavily into ultra high pressure water jetting" during previous jobs. (*Id.*)

### 5. The Incident

Adeyinka was hired by NYCHA to perform lead abatement work in March 2003. (Yankee Fiber's 56.1 ¶ 2.) In the summer of 2003, Adeyinka was working on a NYCHA project at the Manhattanville Community Center in Manhattan (the "work site"). (*Id.* ¶ 3.) Adeyinka's work consisted of using the water jet to remove lead paint from the walls of a building at the work site. (*Id.* ¶ 5–6.)

At approximately 9:30 a.m. on June 27, 2003, Adeyinka was using the water jet's mini-scrubber attachment while standing on a ladder in a closet at the work site. (*Id.* ¶ 20.) Specifically, Adeyinka was standing on the fifth step from the bottom of the ladder, approximately five feet from the ground, and using the mini-scrubber to remove lead paint from a cinder block wall. (*Id.*) At one point, according to Adeyinka, he placed the head of the mini-scrubber against the wall and depressed its handles in order to release the pressurized water. (Adeyinka Tr. at 182–83.) After approximately three minutes of operation, Adeyinka asserts that the "pressure" in the water jet "fluctuate[d]," causing the device to "lift itself from the wall" and to push back against Adeyinka.[4] (*Id.* at 183.) Adeyinka asserts that, due to this "backward thrust," he lost his grip on the mini-scrubber's handles, causing the device to rotate

towards plaintiff and to spray hot water on his hand, causing severe injuries thereto. (*Id.*) Adeyinka also asserts that the backward thrust of the mini-scrubber and his reaction to the spraying hot water caused him to fall backwards off the ladder on which he was standing.[5] (*See id.* at 188.)

### 6. Problems with the Water Jet Prior to the Incident

Prior to the incident, Adeyinka had been working on the project for approximately two weeks. (Yankee Fiber's 56.1 ¶ 13.) During this time, plaintiff used the water jet on approximately four to five days. (*Id.* ¶ 14.) Adeyinka asserts that, prior to the day of the incident, he experienced several problems, including pressure fluctuations, while using the water jet at the work site. (Pl.'s 56.1 ¶ 17; *see* Adeyinka Tr. at 146–48.) Nevertheless, during that time, Adeyinka neither examined the water jet for warning labels, made any complaints to his supervisors or Yankee Fiber employees regarding the water jet's performance or problems related thereto, nor requested additional training from Yankee Fiber employees stationed at the site. (Yankee Fiber's 56.1 ¶¶ 11–12, 17–19.) However, according to Glen Swinney, a NYCHA supervisor at the work site, NYCHA employees other than plaintiff complained to Yankee Fiber employees at the work site, both prior to and on the day of the incident, that the pressure on the water jet would frequently fluctuate without notice. (Aqua Dyne's 56.1 ¶¶ 10–11; Swinney Tr. at 36–37.)

**4.** Adeyinka does not specifically identify the type of pressure—water or vacuum—that "fluctuate[d]" as he was using the water jet. However, Yankee Fiber fails to argue that this distinction is material to the issues presented in the instant motion. Indeed, at oral argument, the parties' counsel concurred that a fluctuation in *either* the water pressure or the vacuum pressure level could upset the "equilibrium" needed to hold the mini-scrubber

against the wall while it was emitting water, thereby resulting in the mini-scrubber pulling away from the wall and generating a backward thrust in the direction of the mini-scrubber's operator. (*See* Oral Arg. Tr. at 66–68.)

**5.** The Court hereinafter refers to the sequence of events leading to plaintiff's injuries as the "incident."

Following the incident, an inspection of the water jet failed to reveal any malfunctions or problems with the device. (*Id.* ¶ 53.) In addition, on June 30, 2003, after the project was completed at the work site, Swinney signed a "Project Sign–Off Sheet," wherein he certified that he had "inspected the work performed by Yankee Fiber" and that it was "completed to [his] satisfaction ..." (Yankee Fiber's 56.1 ¶ 54; Cerussi Decl. Ex. M.)

### 7. Yankee Fiber's Training of NYCHA Workers

Yankee Fiber leased the water jet on several occasions in 2002 and 2003. It is undisputed that, prior to first leasing the water jet to NYCHA in 2002, Yankee Fiber's employees provided instruction to some NYCHA workers, other than Adeyinka, regarding the use and operation of the water jet. (Pl.'s 56.1 ¶ 10; Aqua Dyne's 56.1 ¶ 15; *see* Swinney Tr. at 33–34.) Specifically, in 2002, Yankee Fiber held one "hands-on" training session with certain NYCHA employees regarding the use and operation of the water jet. (Yankee Fiber's 56.1 ¶ 42.) Adeyinka was not employed by NYCHA at that time, and did not attend the training session.

According to Yankee Fiber, during the initial water jet training in 2002, Michael Mallinson, a Yankee Fiber employee, told the NYCHA workers not to use the mini-scrubber while standing on a ladder. (Yankee Fiber's 56.1 ¶¶ 45, 46.) However, according to Swinney, who attended the session, Yankee Fiber did *not* advise him, at the training session or at any other time, that NYCHA workers should avoid standing on ladders while operating the water jet.[6] (Aqua Dyne 56.1 ¶ 20; Swinney Tr. at 74.)

Similarly, Adeyinka asserts that he was not instructed by NYCHA or Yankee Fiber to avoid using the water jet or the mini-scrubber while standing on a ladder. (Adeyinka Tr. at 172.) Rather, Adeyinka asserts that, on the day of the incident, he was instructed by his NYCHA supervisor, Swinney, to use a ladder while working if "[c]ommon sense" required it.[7] (Adeyinka Tr. at 172.) Adeyinka also asserts that Yankee Fiber employees saw NYCHA workers—on at least one or two occasions—using the water jet while standing on a ladder. (Pl.'s 56.1 ¶ 45; Mallinson Tr. at 58–59.)

It is undisputed that, throughout the course of the project in June 2003, Yankee Fiber did not attempt to warn NYCHA employees at the work site of any dangers associated with the use and operation of the water jet. (Yankee Fiber's 56.1 ¶¶ 35–39; Swinney Tr. at 34; Mallinson Tr. at 103.) As such, it is also undisputed that Yankee Fiber employees did not provide any training to Adeyinka regarding the use and operation of the water jet.[8] (*Id.* ¶ 9; Adeyinka Tr. at 116.)

Moreover, according to Swinney, Yankee Fiber did not provide NYCHA, at any time, with written instructions or warnings regarding the water jet, such as the following materials published by Aqua Dyne and originally included with the water jet: (1) the mini-scrubber operation and maintenance manual, and (2) the water jet "warning sheet," and/or the manual entitled "Recommended Practices for the Use of

---

**6.** Swinney asserts that the training session lasted five to ten minutes. (Pl.'s 56.1 ¶ 142.)

**7.** Swinney has indicated that he did not tell Adeyinka to use a ladder while in the closet but that, in general, NYCHA lead abatement workers "would have just used the ladder. . . .

[Y]ou would use what the job calls for." (Swinney Tr. at 51.)

**8.** According to Adeyinka, he was the only lead abatement worker at the work site (out of eight total) who had not previously used the water jet. (Adeyinka Tr. at 117.)

Manually Operated High–Pressure Water Jetting Equipment" (the "Recommended Practices Manual"). (Aqua Dyne 56.1 ¶ 13; see Swinney Tr. at 40, 72–73; see also Mallinson Tr. at 34.) As a result, no such materials were provided to Adeyinka, or any other NYCHA employees at the work site.

### 8. Yankee Fiber's Supervision of the Water Jet at the Work Site

Two Yankee Fiber employees, Mallinson and Joe Bistransky, were stationed at the work site for the purpose of installing, maintaining, and monitoring the water jet during its use by NYCHA employees. (Mallinson Tr. at 39.) At the work site, Mallinson and Bistransky stayed with the water jet's main unit, which was located outside of the building in which the NYCHA employees were using the mini scrubber to perform lead abatement work. (See id. at 87.) Mallinson indicates that, as part of his "monitoring" duties, he was responsible for setting the pressure levels in the water jet and making adjustments thereto at the request of NYCHA workers. (See Mallinson Tr. at 96–97.)

Yankee Fiber asserts that, prior to the incident, Mallinson did not receive any complaints from NYCHA employees at the work site regarding pressure fluctuations in the water jet.[9] (Yankee Fiber's 56.1 ¶ 50.) However, Swinney asserts that he complained to the on-site Yankee Fiber employees regarding the pressure levels in the water jet.[10] (Swinney Tr. at 37; see Pl.'s 56.1 ¶ 50; Aqua Dyne 56.1 ¶ 11.) Specifically, according to Swinney, he repeatedly complained to the Yankee Fiber employees at the work site regarding low

pressure or pressure fluctuations in the water jet, to which the Yankee Fiber employees would respond by shutting the water jet off, working on the device, and then turning it back on. (Swinney Tr. at 37.) Swinney asserts that, on the day of the incident, (1) the pressure on the water jet repeatedly fluctuated and sometimes became too low to hold the head of the mini-scrubber against the cleaning surface; (2) NYCHA workers reported this problem to Swinney; (3) Swinney, in turn, reported these problems to the on-site Yankee Fiber employees; (4) the Yankee Fiber employees turned the water jet off "four or five times" in order to address the pressure fluctuations; and, (5) when the water jet was turned back on, the pressure would temporarily return to normal levels. (Id. at 36–38.)

### 9. Yankee Fiber's Leasing of Lead Abatement Equipment Prior to the Incident

Yankee Fiber asserts that its practice of leasing lead abatement equipment—in particular, the water jet—was incidental to its primary business of performing lead abatement work. (See Hutzler Aff. ¶ 5.) In support, Yankee Fiber asserts that, in 2002 and 2003, it leased the water jet on eight occasions, including six or seven leases of the water jet to NYCHA.[11] (See Yankee Fiber's 56.1 ¶¶ 30–31; Mallinson Tr. at 27; Hutzler Tr. at 202.)

According to Yankee Fiber, it earned $99,500.00 from the six or seven leases of the water jet to NYCHA, which represents approximately 1.7% of Yankee Fiber's total sales revenue for 2002 and 2003. This

---

**9.** Yankee Fiber did not keep a log of the pressure levels in the water jet. (See Mallinson Tr. at 48.)

**10.** Swinney did not specifically identify the Yankee Fiber employees that allegedly received his complaints.

**11.** Yankee Fiber also leased the water jet to a "painting contractor" at some point in 2002 or 2003 (see Hutzler Tr. at 202), but has failed to offer any other details concerning this purported lease.

figure exceeds the purchase price paid for the water jet by $34,705. (*See* Yankee Fiber's 56.1 ¶¶ 30–31.) Yankee Fiber has failed to produce any documentation in support of these sales figures, other than the affidavits of Hutzler.

Initially, Yankee Fiber asserted that its leasing of the water jet on seven or eight occasions constituted the entirety of its equipment leasing business. Specifically, in a sworn affidavit submitted with Yankee Fiber's opening brief, Hutzler asserted that the leasing of the water jet "accounted for approximately 1% of Yankee Fiber's sales for the years 2002 and 2003" (*id.* ¶ 9), but that, "[o]therwise, Yankee Fiber *has not leased any of its equipment* since its inception in 1984" (*id.* (emphasis added)).

However, in his opposition papers, plaintiff pointed out that Hutzler's statements in the first affidavit plainly contradicted his deposition testimony, wherein Hutzler indicated that Yankee Fiber had previously leased several types of lead abatement equipment other than the water jet, including "nuclear grade filtered vacuum cleaners, diesel powered vacuum[s], negative air machines, [and] water jets ..." (Hutzler Tr. at 18.) Subsequently, Hutzler submitted to the Court a supplemental affidavit, wherein he stated that, from 1984 to 2002, Yankee Fiber had leased several types of lead abatement equipment "at most ten (10) times...." (Hutzler Supp. Aff. ¶ 17), and that, from January 2002 through 2003, Yankee Fiber had leased such equipment, *including* the water jet, nine times (Yan-

kee Fiber's 56.1 ¶¶ 30–31; Hutzler Supp. Aff. ¶ 13).[12]

Plaintiff further asserts that there is evidence suggesting that Yankee Fiber has leased the water jet on more than the seven or eight occasions to which it has admitted. In support, plaintiff relies upon Mallinson's statements at his deposition, wherein he had the following exchange with Aqua Dyne's counsel:

Q: "And other than those times that [NYCHA] was a customer and its employee or crew members actually used the mini scrubbers, can you recall any other times during your employment term at Yankee Fiber where the customers, employees or crew members would actually use the mini scrubbers to apply the water blast? ... [A]re you able to break down into a percentage [such as] 60/40, 50/50, whatever it may be, the number of times that a customer's crew members would actually apply the water blast ... as opposed to when Yankee Fiber's employees or crew members would actually ... apply the water pressure?"

Mallinson: "I—60/40, maybe. I don't really know.

Q: " '60/40' meaning what?"

Mallinson: "60 percent of the time we did the actual work and 40 percent of the time we would lease the machine and the customer would do the work themselves."

---

12. As such, it appears that Hutzler's assertions in the first affidavit are simply inconsistent with (1) his deposition testimony concerning the kinds of equipment leased by Yankee Fiber, and (2) his assertions in the second affidavit concerning the nature and frequency of lead abatement equipment leases by Yankee Fiber. While these discrepancies do not bear on the outcome reached here— Yankee Fiber's motion against plaintiff's strict liability, failure to warn, and negligence claims fails, for the reasons set forth below, based on the facts asserted in either the first or second affidavit—the Court notes its concern that Hutzler has not been fully candid in his submissions to the Court. Indeed, during the course of this litigation, Hutzler has failed to submit any documentary evidence in support of the various figures he has cited to this Court.

(Mallinson Tr. at 29–30.)[13] According to plaintiff, this exchange indicates that leases comprised 40 percent of Yankee Fiber's business related to the water jet, thus undermining Yankee Fiber's assertion that leasing the water jet was merely "incidental to its primary business." (*See* Pl.'s Opp. Mem. at 6.)

### B. Procedural History

On August 4, 2004, Adeyinka initiated this action by filing a complaint in the Supreme Court of the State of New York, Bronx County. Yankee Fiber removed the action to this Court on January 21, 2005. On February 15, 2005, Yankee Fiber filed an answer and a cross-claim against Aqua Dyne for indemnity and contribution. On November 2, 2006, Aqua Dyne filed an answer to the cross-claim and asserted its own cross-claims against Yankee Fiber for indemnity and contribution. On July 9, 2007, Yankee Fiber filed the instant motion for summary judgment. On September 4, 2007, the case was reassigned from the Honorable Kenneth M. Karas, District Judge, to the undersigned. On June 27, 2008, the Court heard oral argument regarding Yankee Fiber's motion.

### II. Standard of Review

The standards for summary judgment are well settled. The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir.2005). Pursuant to Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir.2008). "A dispute about a 'genuine issue exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir.2007)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

### III. Discussion

#### A. Plaintiff's Claims

##### 1. Strict Products Liability

Yankee Fiber moves for summary judgment against plaintiff's claim that Yankee Fiber is strictly liable for plaintiff's injuries allegedly resulting from his use of the water jet. (*See* Compl. ¶¶ 51–52.) Specifically, Yankee Fiber argues that, because it was not "regularly involved" in leasing the water jet to customers, it was merely a "casual seller" of the water jet and, therefore, cannot be held strictly liable for any injuries arising from plaintiff's use of the water jet. (*See* Yankee Fiber's Mem. at 11.) For the following reasons, the Court rejects Yankee Fiber's motion for summary judgment on this basis.

"Manufacturers of defective products may be held strictly liable for injury caused by their products, regardless of privity, foreseeability or due care."[14]

---

**13.** Mallinson worked for Yankee Fiber from August of 1998 to March of 2004.

**14.** In considering a motion for summary judgment in a diversity action, a federal district court must look to the relevant state substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The parties agree that this case is governed by New York law.

*Sukljian v. Charles Ross & Son Co., Inc.,* 69 N.Y.2d 89, 511 N.Y.S.2d 821, 503 N.E.2d 1358, 1360 (1986) (internal citation omitted). This strict liability also extends to "sellers" who "by reason of their continuing relationships with manufacturers, are most often in a position to exert pressure for the improved safety of products and can recover increased costs within their commercial dealings, or through contribution or indemnification in litigation ..." *Id.* Therefore, "[s]trict products liability ... applies to sellers who engage in product sales in the ordinary course of their business." *Sprung v. MTR Ravensburg Inc.,* 99 N.Y.2d 468, 758 N.Y.S.2d 271, 788 N.E.2d 620, 622 (2003) ("[T]he burden of accidental injuries caused by defective products is better placed on those who produce and market them, and should be treated as a cost of business against which insurance can be obtained") (internal citation omitted).

Moreover, it is well settled under New York law that strict products liability claims and the "casual seller" doctrine apply with equal force to commercial lessors of defective products. *See, e.g., Assam v. Deer Park Spring Water, Inc.,* 163 F.R.D. 400, 405 (E.D.N.Y.1995) ("Leases made by individuals in the business of leasing a particular product can give rise to a cause of action sounding in strict products liability.") (citing *Buley v. Beacon Tex–Print Ltd.,* 118 A.D.2d 630, 499 N.Y.S.2d 782, 783 (N.Y.App.Div.1986)); *Winckel v. Atlantic Rentals & Sales, Inc.,* 159 A.D.2d 124, 557 N.Y.S.2d 951, 952 (N.Y.App.Div.1990) ("A commercial lessor who introduces a defective product into the marketplace should be subject to the same potential liability that faces the manufacturer or retailer of a defective product") *modified on other grounds by* 195 A.D.2d 599, 600 N.Y.S.2d 949, 951 (N.Y.App.Div.1993); *Opera v. Hyva, Inc.,* 86 A.D.2d 373, 450 N.Y.S.2d 615, 618 (N.Y.App.Div.1982) ("Since defen-

dant was in the business of renting equipment, it was liable to plaintiff in strict liability if it rented him defective equipment") (internal citations omitted).

However, " 'casual' or 'occasional' " sellers or lessors of products "are not subject to claims of strict liability." *Id.,* 758 N.Y.S.2d 271, 788 N.E.2d at 623 (internal citations omitted); *see, e.g., Gonzalez v. Rutherford Corp.,* 881 F.Supp. 829, 835 (E.D.N.Y.1995) ("[A]n action for strict products liability will not lie against a 'casual or occasional seller' of used equipment") (citing *Sukljian,* 511 N.Y.S.2d 821, 503 N.E.2d at 1360–61). The New York Court of Appeals has observed that, "[a]s a practical matter, the occasional seller "has neither the opportunity, nor the incentive, nor the protection of the manufacturer or seller who puts that product into the stream of commerce as a normal part of its business, and the public consumer does not have the same expectation when it buys from such a seller.' " *Sprung,* 758 N.Y.S.2d 271, 788 N.E.2d at 622 (quoting *Sukljian,* 511 N.Y.S.2d 821, 503 N.E.2d at 1361). Thus, as opposed to strict liability, "[a]t most, the duty of a casual or occasional seller would be to warn the person to whom the product is supplied of known defects that are not obvious or readily discernible." *Sukljian,* 511 N.Y.S.2d 821, 503 N.E.2d at 1362.

In *Sukljian v. Charles Ross & Son Co., Inc.,* the New York Court of Appeals found that the defendant was a casual seller not subject to strict liability where the defendant's sale of a surplus piece of equipment "was wholly incidental to [its] regular business...." 511 N.Y.S.2d 821, 503 N.E.2d at 1361. Specifically, the defendant, General Electric, sold an excess "grinding mill" at a "surplus sale" on an "as is" basis for only 1% of the mill's original purchase price. *Id.,* 511 N.Y.S.2d 821, 503 N.E.2d at 1359–

61. The court held that summary judgment against plaintiff's strict liability claim was appropriate where the defendant held only "two or three surplus sales a year," derived no profit from such sales, and was otherwise not engaged in the business of selling industrial machinery. *See id.*, 511 N.Y.S.2d 821, 503 N.E.2d at 1359. The court also observed that there was no indication that the defendant "undertook any special responsibility to the public for product safety, or was perceived by the public as having done so, or was better able to spread any loss caused by such defective products ..." *Id.*, 511 N.Y.S.2d 821, 503 N.E.2d at 1361.

Similarly, in *Gebo v. Black Clawson Co.*, the New York Court of Appeals determined that the defendant paper mill was properly found to be a "casual seller" where it sold a single piece of surplus machinery almost three and one-half years prior to the date when plaintiff was injured by the machine, and derived no "significant commercial or economic benefit from the one-time bulk sale...." 92 N.Y.2d 387, 681 N.Y.S.2d 221, 703 N.E.2d 1234, 1238 (1998). The court observed that strict liability was inappropriate where the record established, *inter alia*, that the defendant merely engaged in a "single act" related to the sale of the surplus machinery. *Id.*, 681 N.Y.S.2d 221, 703 N.E.2d at 1238.

By contrast, in *Walusimbi v. Epco Leesona Corp.*, the Honorable Eugene H. Nickerson, District Judge, rejected the defendant's assertion of the "casual seller" doctrine at the summary judgment stage and found the existence of a disputed issue concerning whether the defendant was strictly liable for injuries arising from its sale of an "injection molding machine." No. 84 Civ. 1574, 1988 WL 14466, at *3 (E.D.N.Y. Feb. 10, 1988). The court observed that, unlike the seller in *Sukljian*, the defendant "did not casually dispose of excess equipment on an 'as is' basis" but, rather, "acquired the machine, installed [the purchaser's specified] mold, and operated and maintained it. [The defendant] also assisted in the machine's start-up at [the plaintiffs employer's factory]." *Id.* As such, the court concluded that "[f]his was not a casual sale but rather a significant undertaking by which [the defendant-seller] assumed a responsibility to the public." *Id.*

■  Similarly, in this case, plaintiff has established a genuine issue of material fact concerning whether Yankee Fiber leased lead abatement equipment in the regular course of its business. Indeed, plaintiff has presented ample evidence—set forth above and discussed further below—from which a reasonable jury could find that, rather than acting as a casual lessor, Yankee Fiber engaged in the leasing of lead abatement equipment and, in particular, the water jet "in the ordinary course of [its] business," *Sprung*, 758 N.Y.S.2d 271, 788 N.E.2d at 622, and derived a "significant commercial ... benefit" therefrom, *Gebo*, 681 N.Y.S.2d 221, 703 N.E.2d at 1238.

First, plaintiff points to Mallinson's statement that, during his employment with Yankee Fiber, Yankee Fiber employees "did the actual work" of using the water jet themselves approximately "60 percent of the time," but that, during the remaining "40 percent of the time," Yankee Fiber "would lease the machine and the customer would do the work themselves." (Mallinson Tr. at 30.) Drawing all reasonable inferences in plaintiff's favor, a reasonable jury could find that Mallinson's statement weighs in favor of finding that Yankee Fiber leased the water jet on an "ordinary" rather than "occasional" basis. *Sukljian*, 511 N.Y.S.2d 821, 503 N.E.2d at 1360–61.

Yankee Fiber makes two arguments in response to this evidence. Yankee Fiber asserts that Mallinson cannot be said to have "provide[d] definitive testimony" on this point given that Mallinson prefaced his answer by stating that he did not "really know" the answer to counsel's question. (*See* Yankee Fiber's Reply Mem. at 4.) The Court rejects this argument. At this stage of the case, plaintiff need not provide "definitive testimony" on *any* point in order to withstand Yankee Fiber's motion; rather, plaintiff must only point to evidence sufficient to establish a genuine issue of material fact underlying his claims. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Moreover, to the extent that Yankee Fiber argues that Mallinson should be found not credible based on his statement that he did not "really know" the answer, it is clearly inappropriate, at this stage of the case, for the Court to determine issues of credibility. *See, e.g., Nimely v. City of New York,* 414 F.3d 381, 397 (2d Cir.2005) ("It is a well-recognized principle of our trial system that determining the weight and credibility of a [witness's] testimony ... belongs to the jury ....") (alterations in original) (internal citation and quotation marks omitted). Rather, in this instance, the Court finds that a reasonable jury could conclude that, by stating "I don't know," Mallinson was merely conveying his uncertainty regarding the precision of his "60/40" estimate, and *not* indicating that he was unaware that Yankee Fiber "leased" the water jet on a significant number of occasions.

In addition, Yankee Fiber argues that Mallinson is "a non-party" who is no longer employed by Yankee Fiber and, therefore, "has insufficient knowledge and/or authority to bind Yankee Fiber" on the issue of the number of instances it leased the water jet. (Yankee Fiber's Reply Mem. at 4.) However, Yankee Fiber has failed to point to any authority—and the Court is aware of none—in support of the proposition that a non party witness or a former employee cannot, as a matter of law, offer potentially adverse testimony against a party and/or that witness' former employer. Furthermore, to the extent that this argument constitutes a challenge to the admissibility of Malhnson's testimony, it is clear that Mallinson offered this testimony on the basis of his personal knowledge of the practices employed by Yankee Fiber during his career with the company. (*See* Mallinson Tr. at 30 (stating that "*we* did the actual work" and "*we* would lease the machine") (emphasis added).) Thus, the Court finds that Mallinson's testimony is admissible and, therefore, may be considered in resolving Yankee Fiber's summary judgment motion.

Second, plaintiff points to the fact that Yankee Fiber leased the water jet to NYCHA on six or seven occasions in 2002 and 2003 (*see* Yankee Fiber's 56.1 ¶¶ 30–31; Mallinson Tr. at 27; Hutzler Tr. at 202), and derived $99,500.00 from these leases—a sum that exceeds the purchase price paid by Yankee Leasing for the water jet by $34,705 (*see* Yankee Fiber's 56.1 ¶¶ 30–31). Thus, even assuming *arguendo* that Yankee Fiber leased the water jet on only eight occasions—an assertion that may be undermined by Mallinson's testimony—and relying solely upon the revenue derived from the six or seven NYCHA leases, it is clear that the number of transactions at issue here and the amount of revenue derived therefrom far exceeds that found in *Sukljian* or *Gebo*. In those case, the respective defendants made, at most, six sales and a single sale of a product, and derived *no* significant economic or commercial benefits from such sales. *See Sukljian,* 511 N.Y.S.2d 821, 503 N.E.2d at 1361; *Gebo,* 681 N.Y.S.2d 221, 703 N.E.2d at 1238.

Third, plaintiff points to the fact that Yankee Fiber employees operated and maintained the water jet while it was being leased by others. Specifically, it is undisputed that, during the lease period, Yankee Fiber employees were sent to the work site in order to operate the water and vacuum pressure controls, to monitor the performance of the water jet, and to perform on-site maintenance, if necessary. (*See* Yankee Fiber's 56.1 ¶¶ 42, 45, 46; Hutzler Tr. at 19.) Indeed, Yankee Fiber's president has testified that, whenever the company leased the water jet, it "sen[t] a technician to run the equipment" as part of its "normal practice." (*See* Hutzler Tr. at 18.) In addition, plaintiff has presented evidence—namely, the original purchasing invoice for the water jet—indicating that the water jet was not purchased from Aqua Dyne by the entity known as Yankee Fiber but by a separate entity under Hutzler's control, Yankee Leasing, to which plaintiff refers to as Yankee Fiber's "leasing division." (Pl.'s 56.1 ¶ 24; Pl.'s Ex. I.) Thus, there is sufficient evidence for a reasonable jury to conclude that, as with the defendant in *Walusimbi*, Yankee Fiber did not "casually" lease the water jet but, rather, "acquired the machine" for the purpose of leasing it to others, "operated and maintained it," and "assisted" in the water jet's operation. *See* 1988 WL 14466, at *3.

On the basis of the above-cited evidence, and drawing all reasonable inferences in plaintiff's favor, the Court cannot conclude, as a matter of law, that Yankee Fiber was a casual or occasional lessor of the water jet. Rather, there is sufficient evidence to establish a genuine issue of material fact concerning whether Yankee Fiber was engaged in the business of leasing the water jet for profit, and providing ongoing supervision and maintenance of the device as part of its leasing business.

Indeed, Yankee Fiber has failed to cite *any* case wherein a similarly situated defendant—namely, one that engaged in more than six sales or leases of an item over a two year period immediately preceding the incident at issue, and routinely provided monitoring and maintenance services related to the product at issue—was found to be a casual seller of the item at issue. Rather, in support of its casual seller argument, Yankee Fiber points to (1) *Sukljian*, 511 N.Y.S.2d 821, 503 N.E.2d at 1361, wherein the defendant engaged in two to three sales of surplus equipment a year and derived no economic benefit therefrom; and (2) *Stiles v. Batavia Atomic Horseshoes*, 81 N.Y.2d 950, 597 N.Y.S.2d 666, 613 N.E.2d 572, 573 (1993), wherein the defendant engaged in three—and only three—instances of re-selling used machinery, and the piece of machinery at issue "was never unloaded at [the defendant's place of business], but instead sold directly off the truck that had transported it from an equipment auction." [15] Thus, the hold-

---

**15.** Yankee Fiber also points to *Piper v. Kabar Mfg. Corp.*, 251 A.D.2d 1050, 674 N.Y.S.2d 184, 185 (N.Y.App.Div.1998), wherein the Appellate Division found that the defendant was a casual seller, but failed to recite any of the facts underlying its decision. As such, the decision fails to provide persuasive support for Yankee Fiber's motion. (*See* Yankee Fiber's Mem. at 12.) Finally, Yankee Fiber cites to *Gobhai v. KLM Royal Dutch Airlines*, 57 N.Y.2d 839, 455 N.Y.S.2d 764, 442 N.E.2d 61, 61 (1982), but fails to offer any analysis of that case. (*See* Yankee Fiber's Mem. at 11.)

The Court notes that the Appellate Division's original decision in *Gobhai v. KLM Royal Dutch Airlines*, 85 A.D.2d 566, 445 N.Y.S.2d 445, 446–47 (N.Y.App.Div.1981), wherein the court found that the defendant airline was not subject to strict liability based on its practice of providing slippers to passengers free of charge, and which the New York Court of Appeals affirmed without comment in the decision cited by Yankee Fiber, was eventually recalled by the Appellate Division in a subsequent order and is therefore a nullity. *See*

ings in these cases clearly do not require this Court to apply the casual seller doctrine to Yankee Fiber.

Moreover, in denying Yankee Fiber's motion on this basis, the Court is mindful of the public policy considerations underlying strict products liability claims, and finds that, at this stage of the case, the Court cannot conclude that such considerations weigh in favor of shielding Yankee Fiber from plaintiff's strict liability claims. Specifically, there are genuine issues of material fact underlying these policy concerns, including whether Yankee Fiber (1) assumed a "special responsibility for public safety" by "regularly" leasing the water jet and providing operational and maintenance services to what may be a significant number of customers, thereby causing its lessees to "come to expect [Yankee Fiber] to stand behind their goods"; and/or (2) put the water jet "into the stream of commerce as a normal part of its business" and, therefore, had the opportunity and the incentive to "exert pressure for the improved safety" of the water jet through "contribution or indemnification [of the manufacturer] in litigation"[16] *See Suklji-an,* 511 N.Y.S.2d 821, 503 N.E.2d at 1360–61.

Accordingly, for the foregoing reasons, Yankee Fiber's motion for summary judgment against plaintiffs strict products liability claims is denied.

### 2. Failure to Warn

Plaintiff alleges that Yankee Fiber failed to provide adequate warnings to plaintiff regarding the alleged defects in the water jet.[17] Yankee Fiber seeks summary judgment against this claim on the ground that plaintiff "was aware" of the alleged defects that caused his injuries prior to the incident. (Yankee Fiber's Mem. at 16.) For the following reasons, the Court finds that Yankee Fiber has failed to satisfy its burden of demonstrating the absence of a genuine issue of material fact on this point.

*Gobhai v. KLM Royal Dutch Airlines,* 458 N.Y.S.2d 879, 879 (N.Y.App.Div.1983).

16. Moreover, it is clear that Yankee Fiber now concedes that, apart from the water jet, it "also rented vacuums and negative air machines" on fourteen occasions from 1984 through 2007. (*See* Hutzler Supp. Aff. ¶¶ 12–18.) However, because the Court has already denied Yankee Fiber's motion for summary judgment on the ground that it is a "casual seller," the Court declines to reach the issue of whether Yankee Fiber's leasing of these additional types of equipment should also be considered in addressing Yankee Fiber's casual lessor argument. Nevertheless, the Court notes that the weight of authority appears to favor considering the entirety of lead abatement equipment leased by Yankee Fiber. For instance, in conducting the casual seller inquiry, the New York Court of Appeals has examined the defendant's sales of "machinery" generally, and has not examined, for instance, the defendant's sale of the *specific* "high-speed, three-roll grinding mill" at issue while excluding other types of industrial ma-

chinery sold by the defendant, *see Sukljian,* 511 N.Y.S.2d 821, 503 N.E.2d at 1359, or the defendant's sale of the *specific* type of "punch press" at issue while discounting its sale of other types of used machinery, *see Stiles,* 597 N.Y.S.2d 666, 613 N.E.2d at 573.

17. In his opposition papers, plaintiff describes his failure-to-warn claim as an "alternative" theory of recovery against Yankee Fiber in the event that Yankee Fiber is ultimately determined to be a "casual" lessor. (*See* Pl.'s Mem. at 15.) However, Yankee Fiber does not argue that plaintiff may only recover for Yankee Fiber's alleged failure to warn in the event that plaintiff's strict liability claim fails, and there appears to be no legal rule to that effect. Rather, "[w]here liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent." *Martin v. Hacker,* 83 N.Y.S.2d 1, 607 N.Y.S.2d 598, 628 N.E.2d 1308, 1311 n. 1 (1993); *see also Humphrey v. Diamant Boart, Inc.,* 556 F.Supp.2d 167, 178–79 (E.D.N.Y. 2008) (citing *Martin,* 607 N.Y.S.2d 598, 628 N.E.2d at 1311).

■ Under New York law, in order to prevail on a failure to warn claim, a plaintiff must show the following: (1) the defendant had a duty to warn; (2) the defendant breached the duty to warn in a manner that rendered the product defective, *i.e.,* reasonably certain to be dangerous; (3) the defect was the proximate cause of the plaintiff's injury; and (4) the plaintiff suffered loss or damage. *See McCarthy v. Olin Corp.,* 119 F.3d 148, 156 (2d Cir.1997) (citing *Becker v. Schwartz,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807, 811 (1978)); *Piper,* 674 N.Y.S.2d at 185 (extending liability for failure to warn to a lessor). In regard to the first element, "[t]he existence of a duty is a question of law to be decided by the court." *McCarthy,* 119 F.3d at 156.

■ Notably, the New York Court of Appeals has described the standard for evaluating "failure-to-warn" liability as "intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Liriano v. Hobart Corp.* (*"Liriano I"*), 92 N.Y.2d 232, 677 N.Y.S.2d 764, 700 N.E.2d 303, 309 (1998). Given this fact-intensive inquiry, as the Second Circuit has emphasized, "[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." *Urena v. Biro Mfg. Co.,* 114 F.3d 359, 366 (2d Cir.1997) (citing *Beyrle v. Finneron,* 199 A.D.2d 1022, 606 N.Y.S.2d 465, 466 (N.Y.App.Div.1993)). *See also Liriano v. Hobart Corp.* (*"Liriano II"*), 132 F.3d 124, 131 (2d Cir.1998) (stating that courts have "squarely h[e]ld that it is up to the jury to decide whether the manufacturer, in fact, has a duty to warn") (internal citations omitted); *Johnson v. Johnson Chem. Co.,* 183 A.D.2d 64, 588 N.Y.S.2d 607, 610 (N.Y.App.Div.1992) ("Whether a particular way of misusing a product is reasonably foreseeable, and whether the warnings which accompany a product are adequate to deter such potential misuse, are ordinarily questions for the jury") (internal citations omitted); *Cooley v. Carter–Wallace Inc.,* 102 A.D.2d 642, 478 N.Y.S.2d 375, 376 (N.Y.App.Div.1984) ("The adequacy of the warning in a products liability case based on a failure to warn is, in all but the most unusual circumstances, a question of fact to be determined at trial"). Nevertheless, "there are certain circumstances where failure to warn claims can be decided as a matter of law: (1) 'where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious'; or (2) where the hazards are 'patently dangerous or pose open and obvious risks.'" *Humphrey v. Diamant Boart, Inc.,* 556 F.Supp.2d 167, 179 (E.D.N.Y.2008) (quoting *Liriano I,* 677 N.Y.S.2d 764, 700 N.E.2d at 308) (additional internal citations omitted).

The Court finds that plaintiff has presented sufficient evidence (1) to make a *prima facie* showing that Yankee Fiber owed a duty to warn plaintiff and (2) to establish, at a minimum, disputed issues of material fact underlying each of the remaining elements of his failure to warn claim. First, while Yankee Fiber does not specifically contest that it had a duty to warn plaintiff of the foreseeable, latent hazards associated with use of the water jet, the Court finds that plaintiff has presented sufficient evidence to make a *prima facie* showing that Yankee Fiber owed a duty to warn plaintiff of such hazards. It is clear that a lessor has a duty to warn "against latent dangers resulting from

foreseeable uses of [a leased] product of which it knew or should have known," *Liriano I,* 677 N.Y.S.2d 764, 700 N.E.2d at 305, where (1) the lessor was engaged in an "ongoing business relationship" with a lessee "to service" the leased items, or (2) the lessor had previously "supervised, authorized, and directed" the maintenance of the leased product prior to its use by the lessee, *Dauernheim v. Lendlease Cars, Inc.,* 238 A.D.2d 462, 656 N.Y.S.2d 671, 673 (N.Y.App.Div.1997); *see also Hopps v. Pengate Handling Systems of New York, Inc.,* 307 A.D.2d 665, 763 N.Y.S.2d 856, 859 (N.Y.App.Div.2003) (finding that a lessor of a forklift owed a duty of care to the lessee's employee "arising out of [the lessor's] status as a repairer of the equipment it provided. The evidence shows that during the two-year period following the ... delivery [of the leased forklift] to [the lessee] and prior to the accident, defendant's service technicians made repeated repairs to the forklift's steering, hydraulic fluid, travel and speed control systems."); *Piper,* 674 N.Y.S.2d at 185 ("Given that [the defendant] was leasing the machine to [the plaintiff], it had some responsibility to understand how the machine worked and whether the alterations of which it had knowledge constituted proper or safe uses").

■ In this case, the record demonstrates that Yankee Fiber was engaged in an "ongoing business relationship" with NYCHA during the period of the water jet lease, whereby Yankee Fiber assumed the responsibility of "servic[ing]" the leased water jet, as well as "supervis[ing], authoriz[ing], and direct[ing]" the operation of the water jet during its use by NYCHA's employees, including plaintiff, at the work site. *Dauernheim,* 656 N.Y.S.2d at 673; Mallinson Tr. at 39 (indicating that Yankee Fiber employees were responsible for installing, maintaining, and monitoring the water jet during its use by NYCHA employees at the work site); Hutzler Tr. at 18. Thus, the Court finds, based on this "ongoing business relationship," *Dauernheim,* 656 N.Y.S.2d at 673, and drawing all reasonable inferences in plaintiff's favor, that Yankee Fiber owed a duty to warn those individuals that were actually operating the water jet of the foreseeable, latent hazards associated with the device. *See Hopps,* 763 N.Y.S.2d at 859 (finding that the lessor owed a duty to warn the lessee's employee—who operated the equipment at issue—of "potential defects" in equipment rented and serviced by the lessee).

■ Second, while Yankee Fiber also fails to specifically contest that its alleged failure to warn plaintiff of *any* latent hazards breached this duty or was the proximate cause of plaintiff's injuries (*see* Yankee Fiber's Reply Mem. at 6), the Court finds there is sufficient evidence in the record to establish a genuine issue of material fact regarding both of these elements. Specifically, Swinney and Victor Nunez—another lead abatement worker employed by NYCHA—asserted that Yankee Fiber failed to warn NYCHA employees that using the water jet while standing on a ladder was hazardous. (*See* Swinney Tr. at 74; Nunez Tr. at 58–59.) As a result, according to plaintiff, his NYCHA supervisor specifically advised plaintiff to use a ladder, if necessary, while operating the water jet, and that plaintiff's eventual use of a ladder directly led to at least some of his alleged injuries. (Adeyinka Tr. at 172.) Although Yankee Fiber has presented some testimonial evidence to the contrary (*see* Yankee Fiber's 56.1 ¶¶ 45, 46), the Court is unable to resolve this factual dispute at the summary judgment stage.

Furthermore, there is sufficient evidence in the record to establish disputed issues of fact concerning whether Yankee Fiber's failure to relay written warnings to

plaintiff breached their duty to warn and was the proximate cause of at least some of his injuries. Specifically, it is undisputed that (1) Yankee Fiber failed to relay to plaintiff any of the written safety materials it received from Aqua Dyne upon Yankee Leasing's purchase of the water jet—including the miniscrubber operation and maintenance manual, the water jet safety warning sheet, and the Recommended Practices Manual (*see* Rankin Tr. at 33, 38, 55)—and (2) Yankee Fiber failed to provide to NYCHA any other written materials regarding hazards associated with the water jet, either when it leased the water jet to NYCHA, when it delivered the water jet to the work site, or at any point during Yankee Fiber's ongoing supervision and monitoring of the water jet at the work site (*see* Mallinson Tr. at 34 (acknowledging that Yankee Fiber has "safety manuals" for the water jet but indicating that he did not know if they were ever forwarded to NYCHA); Swinney Tr. at 72–73 (indicating that, during his time as a NYCHA supervisor, he had never seen the written materials provided by Aqua Dyne to Yankee Fiber)).

These written warnings could reasonably be found to address some, if not all, of the purported latent hazards that allegedly resulted in plaintiff's injuries. For instance, the mini-scrubber operation manual specifically warns, *inter alia*, that "the triggers [activating the device] must never be pulled until ... the operator has been sufficiently braced to handle the back thrust...." (Christman Aff. Ex. G.) The jet safety warning sheet provides, *inter alia*, that "[w]aterblast operators must be

made aware that the cleaning nozzle's discharge jet(s) can inflict serious body wounds. Supervisors should demonstrate the potential danger of discharge jet(s) by showing all new operators the effect of a waterjet by cutting a sharp piece of wood such as a 2' × 4'."[18] (*Id.* Ex. H.) Moreover, the Recommended Practices Manual advises operators of the water jet, *inter alia*, that, "[b]efore beginning work," they "should ensure ... that a stable, secure working platform is available at all times," and that the "reaction force experienced" by the operator "can suddenly change" at certain times, so the operator "should be familiar with this change in thrust" and "should stand in such a way as to be able to withstand this change." (*Id.* Ex. I at p. 21.) Therefore, based on the above-cited evidence, a reasonable jury could conclude that Yankee Fiber's alleged failure to convey warnings to plaintiff or his supervisors regarding latent hazards associated with the water jet breached its duty to warn and cause plaintiff to suffer some or all of the alleged injuries arising from the incident. *See McCarthy,* 119 F.3d at 156.

Accordingly, the Court finds that plaintiff has presented sufficient evidence to establish disputed issues of material fact concerning each element of his failure to warn claim.[19]

Nevertheless, Yankee Fiber argues that, even if plaintiff has established disputed issues of material fact underlying each element of his failure to warn claim, plaintiff was "aware of the pressure fluctuations" in the water jet prior to the time of the incident and, therefore, is barred from as-

---

**18.** The warning sheet also indicates that "[i]n all cases, Aqua–Dyne products are sold with the understanding that the purchaser agrees to thoroughly train all operating and maintenance personnel in the correct and safe installation, operation and maintenance of waterblast equipment and to provide adequate

supervision of personnel at all times." (Christman Aff. Ex. H.)

**19.** Yankee Fiber concedes that plaintiff has satisfied the "loss or damage" element. *Liriano I,* 677 N.Y.S.2d 764, 700 N.E.2d at 308; *see* Oral Arg. Tr. at 21.

serting a failure to warn claim. (*See* Yankee Fiber's Mem. at 16.) However, the record demonstrates that there are material issues of fact that preclude such a finding in this case.

Although plaintiff admitted in his deposition that, prior to the incident, he was aware that the pressure in the water jet sometimes fluctuated without notice (*see* Adeyinka Tr. at 147), there remain disputed issues of material fact concerning whether plaintiff was "*fully* aware of the hazard[s]" that allegedly led to his injuries. *Liriano I*, 677 N.Y.S.2d 764, 700 N.E.2d at 308 (emphasis added). Specifically, according to plaintiff, while he was aware that the pressure in the water jet could "fluctuate" at "any time" (Adeyinka Tr. at 147), he was *not* aware that these fluctuations could cause the mini-scrubber to "spin towards him" and/or "generate[ ] a tremendous backward force" in the event that a fluctuation occurred while the device was in use, or that the water jet was more likely to suffer a loss of pressure when used "on an irregular surface" such as the cinder block wall plaintiff was working on at the time of the incident (*see* PL's Mem. at 16–17).

Thus, it is clear that plaintiff's claim is not narrowly confined to the fluctuating pressure in the water jet, in and of itself, but is based on Yankee Fiber's alleged failure to warn plaintiff of the "combination of hazards" associated with the use of the water jet. *See Humphrey*, 556 F.Supp.2d at 180 ("[P]laintiff's [failure to warn] claim here is not limited to the loosening of the guard blade in isolation; rather, it is also based on the failure to adequately warn that the carbide-toothed

blade was not recommended and could cause kickbacks . . . ."). Indeed, there is sufficient evidence in the record in support of this broader claim from which a reasonable jury could conclude that Yankee Fiber failed to warn plaintiff of the latent dangers associated with use of the water jet, and that plaintiff was not "*fully* aware of [these] hazard[s] through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious . . ." *Liriano I*, 677 N.Y.S.2d 764, 700 N.E.2d at 308 (emphasis added).

Based on the disputed issues of material fact found in the record, the Court finds no reason to depart from the Second Circuit's directive that "[t]he adequacy of [an] instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." [20] *Urena*, 114 F.3d at 366; *accord Liriano II*, 132 F.3d at 127 n. 1. Accordingly, Yankee Fiber's motion for summary judgment against plaintiff's failure to warn claim is denied.

### 3. Negligence

Plaintiff alleges that Yankee Fiber negligently "failed to keep the [water jet] operating properly" during its use by NYCHA employees, including plaintiff, at the work site. (*See* PL's Mem. at 18–19.) At oral argument regarding the instant motion, Yankee Fiber conceded that there were genuine issues of material fact underlying this claim and, therefore, withdrew its motion against the claim. (*See* Oral Arg. Tr. at 17.) Nevertheless, in an abundance of caution and because Yankee Fiber has

---

**20.** At oral argument, Yankee Fiber also argued that, in the event that it was found to be a casual seller, it had satisfied its minimal obligation as a casual lessor to warn NYCHA and/or its employees of the water jet's "known defects that are not obvious or readi-

ly discernible." *Sukljian*, 511 N.Y.S.2d 821, 503 N.E.2d at 1362; *see* Oral Arg. Tr. at 17–18. Because the Court declines to find, as a matter of law, that Yankee Fiber was a casual seller of the water jet, the Court need not reach this issue.

submitted written materials urging this Court to dismiss the claim, the Court proceeds to review the merits of Yankee Fiber's motion against plaintiff's negligence claims, and finds, for the following reasons, that the claim cannot be resolved at this stage of the case.

■ Under New York law, a plaintiff must establish the following elements to prevail on a negligence claim: (1) that a duty of care was owed by the defendant to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) that plaintiff was damaged. *See Van Nostrand v. Froehlich,* 44 A.D.3d 54, 844 N.Y.S.2d 293, 293 (N.Y.App.Div.2007); *Luina v. Katharine Gibbs School N.Y., Inc.,* 37 A.D.3d 555, 830 N.Y.S.2d 263, 263 (N.Y.App.Div. 2007). Here, plaintiff has presented sufficient evidence to establish a genuine dispute as to each of these elements in regard to his negligence claim.

■ First, the Court finds that Yankee Fiber owed a duty to plaintiff to take reasonable care in maintaining and/or operating the water jet during its use at the work site. Specifically, Yankee Fiber concedes that, as part of its lease agreement with NYCHA, Yankee Fiber agreed to assume responsibility for maintaining the water jet and controlling a least part of its operation while the device was being used by NYCHA employees, including plaintiff, at the work site. (*See, e.g.,* Mallinson Tr. at 38–39; Hutzler Tr. at 18; Yankee Fiber's Mem. at 17.) Indeed, Mallinson, the Yankee Fiber employee responsible for supervising the water jet at the work site, has stated that he was closely involved with regulating the pressure level in the water jet, and that, during the course of NYCHA's use of the water jet at the work site, Mallinson and another Yankee Fiber employee were responsible "[i]f something

needed to be repaired" on the water jet. (*See* Mallinson Tr. at 39.) Yankee Fiber's president specifically indicated that, at the work site, the pressure levels of the water jet were "controlled" by the on-site Yankee Fiber employees. (*See* Hutzler Tr. at 104–6.) Similarly, Swinney, the NYCHA supervisor at the work site, has testified that, whenever there was a problem with the water jet not "having pressure," he would report the problem to the on-site Yankee Fiber employees and that those employees would fix, or attempt to fix, the problem. (Swinney Tr. at 38.) Accordingly, the Court finds that, drawing all reasonable inferences in plaintiff's favor, he has presented sufficient evidence to establish that Yankee Fiber owed a duty to plaintiff to take reasonable care in maintaining and/or operating the water jet. *See Hopps,* 763 N.Y.S.2d at 859 (finding that a lessor of construction equipment owed a duty of care to one of the lessee's employees that operated the equipment "arising out of [the defendant-lessor's] status as a repairer of the equipment it provided"); *see also Petty v. New York Cent. R.R,* 322 F.Supp. 1324, 1326 (S.D.N.Y. 1970) ("[I]t is clear that in the case where damages result from the lessor's maintenance, the lessor bears the responsibility for the said damages.").

■ Second, plaintiff has presented sufficient evidence to establish a genuine issue of material fact as to whether Yankee Fiber breached this duty by failing to maintain and/or to operate the water jet in a reasonably safe manner. According to Swinney, on the day of the incident, the pressure on the water jet was fluctuating even more than usual and, at times, "the machine had no pressure whatsoever." (Swinney Tr. at 38.) As a result, the NYCHA workers purportedly had to stop work "every 20 minutes to an hour ... because the [water jet] was malfunction-

ing . . . ." (*Id.*) Swinney further asserts that, on the day of the incident, he made several complaints to the Yankee Fiber employees at the work site regarding these malfunctions—namely, that "[f]here wasn't no pressure" in the water jet. (*Id.*) Swinney asserts that, in response to his complaints, the on-site Yankee Fiber employees repeatedly "shut the machine down . . ., work[ed] on the machine and [then] turn[ed] it back on."[21] (Swinney Tr. at 37.)

Yankee Fiber has presented evidence directly contrary to Swinney's assertions. Specifically, Yankee Fiber points to Mallinson's testimony, wherein he asserts that, during the course of the project at the work site, there were no "operational difficulties" with the water jet, NYCHA employees did not make any complaints regarding the water jet's performance, and no one relayed "safety concerns" of any kind to the on-site Yankee Fiber employees. (*See* Mallinson Tr. at 49.) Indeed, according to Mallinson, he could not recall any "safety complaints" by users of the water jet during any of the NYCHA projects with which Yankee Fiber was involved. (*Id.* at 49.)

Therefore, the record plainly contains material factual disputes as to whether Yankee Fiber knew or should have known of the alleged pressure fluctuations prior to or on the day of the incident, and took reasonable care in responding thereto.

Finally, it is clear that the record contains disputed issues of material fact regarding whether Yankee Fiber's alleged failure to maintain the water jet was the proximate cause of plaintiffs injuries. Specifically, on the basis of the evidence discussed herein, a reasonable jury could conclude that the pressure fluctuations in the water jet caused the device to pull away from the wall and to spray pressurized water on plaintiff's hands, which, in turn, caused plaintiff to fall off the ladder.

Accordingly, because there are genuine issues of material fact underlying each element of plaintiff's negligence claim, the Court denies Yankee Fiber's motion against this claim.[22]

#### 4. Failure to Train

■ Plaintiff asserts that Yankee Fiber was negligent in its "fail[ure] to properly train" NYCHA regarding the use and operation of the water jet. (*See* PL's Opp. Mem. at 20.) The Court grants Yankee Fiber's motion against this claim on the ground that plaintiff has failed to cite any case wherein a seller, lessor, or contractor has been found to owe a duty to train the users or lessors of its products on the operation of the products at issue, and there appears to be an absence of persuasive authority from courts applying New York law to support the existence of such a duty. Moreover, based on plaintiff's opposition papers, it appears that his "failure to train" claim concerns precisely the same alleged omissions that underlie his failure

---

**21.** Similarly, Nunez, the NYCHA employee who was working with plaintiff on the day of the incident, indicated that, in general, when the water jet became "clogged up," he would notify the on-site Yankee Fiber employees, who would then shut the machine down and attempt to fix the problem. (*See* Nunez Tr. at 45–46.) However, Nunez also indicates that he did not make any specific complaints regarding the water jet, nor was he aware of complaints made by other NYCHA employees.

(*See* Nunez Tr. at 31.) Nunez also does not recall experiencing any pressure fluctuations while using the water jet at the work site. (*See id.* at 46.)

**22.** Yankee Fiber concedes that plaintiff has satisfied the "loss or damage" element of his negligence claim. *Liriano I,* 677 N.Y.S.2d 764, 700 N.E.2d at 308; *see* Oral Arg. Tr. at 21.

to warn claim; specifically, plaintiff asserts that "Yankee Fiber's employees failed to properly train" the NYCHA employees by "fail[ing] to provide any written material including instruction manuals, warning literature, or safety literature to [NYCHA]." (PL's Opp. Mem. at 19–21.) Therefore, to the extent that plaintiff asserts a "failure to train" claim independently of his failure to warn claim, the Court grants Yankee Fiber's motion against that claim on the ground that no such duty appears to exist under New York law independently of Yankee Fiber's duty to warn.

### 5. Negligent Entrustment

Yankee Fiber moves for summary judgment against plaintiffs "negligent entrustment" claim. Plaintiff alleges that Yankee Fiber is liable for "negligent entrustment" because it permitted plaintiff to use the water jet when Yankee Fiber's employees knew plaintiff was likely, "because of inexperience, to use [the water jet] in an unsafe manner ..." (Pl's Opp. Mem. at 21.) Yankee Fiber asserts that it did not have reason to believe plaintiff, or any other NYCHA employees, were likely to use the water jet in an unsafe manner. For the following reasons, the Court grants Yankee Fiber's motion against this claim.

The Restatement describes the tort of negligent entrustment, in a provision entitled "Chattel For Use by Person Known to Be Incompetent," as imposing liability upon:

> One who supplies ... a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others ....

Restatement (Second) of Torts § 390. New York courts have construed this tort as requiring the plaintiff to "prove 'some special knowledge" on the part of the defendant "concerning a characteristic or condition peculiar to the plaintiff which renders the plaintiff's use of the chattel unreasonably dangerous...." *Troncoso v. Home Depot, U.S.A., Inc.*, 258 A.D.2d 644, 685 N.Y.S.2d 797, 798 (N.Y.App.Div.1999) (quoting *Zara v. Perzan*, 185 A.D.2d 236, 586 N.Y.S.2d 139, 139–40 (N.Y.App.Div. 1992)); *see Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1064 (2001) ("The tort of negligent entrustment is based on the degree of knowledge the supplier of a chattel has or should have concerning the entrustee's propensity to use the chattel in an improper or dangerous fashion.") (internal citations omitted); *Splawnik v. DiCaprio*, 146 A.D.2d 333, 540 N.Y.S.2d 615, 617 (N.Y.App.Div.1989) ("Most of the case law invoking this doctrine relates to the entrustment of guns or motor vehicles to children, incompetents or intoxicated persons."). In *McCarthy v. Sturm, Ruger and Co., Inc.*, the Honorable Harold Baer, District Judge, observed that Section 390 of the Restatement "limits the negligent entrustment theory to those people a reasonable person would consider lacking in ordinary prudence." 916 F.Supp. 366, 370 (S.D.N.Y.1996). As such, Judge Baer declined to find that the defendant, a gun manufacturer, owed, by reason of its marketing of a potentially dangerous product, a duty "to the general public." *Id.* In so ruling, Judge Baer found that, "[t]o extend this theory [of negligent entrustment] to the general public would be a dramatic change in tort doctrine. It would imply that the general public lacks ordinary prudence and thus undermine the reasonable person concept so central to tort law. The common law has not yet adopted a negligent entrustment rule for the protection of the general public. I decline to adopt one here." *Id.; accord Hamilton*, 727

N.Y.S.2d 7, 750 N.E.2d at 1064 ("There are . . . fatal impediments to imposing a general duty of care here under a negligent entrustment theory").

■ Similarly, in this case, plaintiff argues that, while Yankee Fiber did not owe plaintiff a "special duty," it owed a duty "to everyone who was operating this machine" to ensure that they were sufficiently "experienced" so as to operate the water jet in a reasonably safe manner. (*See* Oral Arg. Tr. at 51.) The Court rejects this argument as inconsistent with well-settled authority regarding the tort of negligent entrustment. As Judge Baer noted in *McCarthy,* courts have not construed the tort as imposing a duty on defendants to examine the competence of "the general public" to whom they market or lease products. 916 F.Supp. at 370. Rather, it is well settled that the tort applies solely where the defendant had knowledge or reason to know that the user of the item at issue was someone that "a reasonable person would consider lacking in ordinary prudence." 916 F.Supp. at 370; *see also Hamilton,* 727 N.Y.S.2d at 16, 750 N.E.2d 1055.

Moreover, plaintiff has failed to cite any case wherein a court has applied the negligent entrustment doctrine to a case involving the lease or sale of equipment to a construction company that employed purportedly "inexperienced" workers. (*See* Pl's Opp. Mem. at 22.) Instead, plaintiff

points to cases concerning the alleged negligent entrustment of (1) an all-terrain vehicle to a seventeen-year old left unsupervised on a family farm, *see Rios v. Smith,* 95 N.Y.2d 647, 722 N.Y.S.2d 220, 744 N.E.2d 1156, 1160 (N.Y.2001) (finding that "a parent owes a duty to protect third parties from harm that is clearly foreseeable from the child's improvident use or operation of a dangerous instrument, where such use is found to be subject to the parent's control"); (2) a horse who was known to be "high[ ] strung, very quick and dangerous" to a rider that the defendant knew was "inexperienced," *Snyder v. Kramer,* 94 A.D.2d 860, 463 N.Y.S.2d 591, 593 (N.Y.App.Div.1983); and (3) a loaded handgun to a woman who was recovering from "severe injuries" and was "very depressed," where the defendant allegedly knew "about [the] decedent's physical and emotional condition," *Splawnik,* 540 N.Y.S.2d at 617.

These cases are clearly distinguishable from the instant case, wherein plaintiff has failed to allege that he suffered from any physical or mental condition that rendered him unable to exercise ordinary prudence and has not established a genuine issue of material fact concerning whether Yankee Fiber was aware of "a characteristic or condition *peculiar to the plaintiff* which render[ed] the plaintiff's use of the chattel unreasonably dangerous. . . .' " *Troncoso,* 685 N.Y.S.2d at 798 (internal citation omitted) (emphasis added).[23] Indeed, although

23. To the extent that plaintiff seeks to rely on portions of intermediate appellate decisions providing that a plaintiff may recover for negligent entrustment based *solely* on evidence that the defendant had "some special knowledge as to a characteristic or defect peculiar to the chattel which renders it unreasonably dangerous," *see Troncoso,* 685 N.Y.S.2d at 798, the Court rejects that argument as inconsistent with New York law as it currently stands. The New York Court of Appeals has clearly held that "[t]he tort of negligent entrustment is based on the degree of knowl-

edge the supplier of a chattel has or should have concerning *the entrustee's propensity* to use the chattel in an improper or dangerous fashion," *Hamilton,* 727 N.Y.S.2d 7, 750 N.E.2d at 1064 (emphasis added), and *not* on the suppliers knowledge of an inherently dangerous "characteristic or defect" found in the chattel itself, *Troncoso,* 685 N.Y.S.2d at 798. Thus, this Court declines to adopt a construction of the tort that would effectively create a "general duty of care . . . under a negligent entrustment theory"—*apart* from strict liabili-

plaintiff presents some evidence indicating that Yankee Fiber employees viewed unidentified NYCHA employees on one or two occasions operating the water jet while standing on a ladder (*see* Mallinson Tr. at 59), he has failed to point to evidence indicating that Yankee Fiber knew or had reason to know that plaintiff *in particular* was likely to use the water jet in an "unreasonably dangerous" manner. *Troncoso*, 685 N.Y.S.2d at 798. Rather, plaintiff has acknowledged that he is unaware of whether any Yankee Fiber employees saw him using the water jet while standing on the ladder (*see* Adeyinka Tr. at 178), and that he never raised any concerns to his NYCHA supervisors or Yankee Fiber about his ability to use the water jet (*see id.* at 189–90). Moreover, there is undisputed evidence in the record demonstrating that, prior to leasing the water jet from Yankee Fiber, NYCHA informed Yankee Fiber that its employees had experience performing lead abatement work (*see* Hutzler Tr. at 103), and that, in the two years preceding the incident, NYCHA had leased the water jet from Yankee Fiber six or seven times, and, on each of those occasions, NYCHA lead abatement workers had used the device supplied by Yankee Fiber without incident (*see* Yankee Fiber's 56.1 ¶ 40; Mallinson Tr. at 27.).

Therefore, given the lack of case law supporting plaintiff's broad construction of the tort and the absence of evidence indicating that Yankee Fiber knew or had reason to know of a characteristic or condition "peculiar to plaintiff" indicating that he was "lacking in ordinary prudence," *McCarthy*, 916 F.Supp. at 370, the Court finds that no reasonable jury could conclude that Yankee Fiber is liable for negligent entrustment. Accordingly, the Court

grants Yankee Fiber's motion for summary judgment against this claim.

B. Aqua Dyne's Cross–Claims

Aqua Dyne asserts cross-claims against Yankee Fiber for common law contribution, common law indemnification, and contractual indemnification. (*See* Aqua Dyne's Ans. ¶¶ 78–79.) Yankee Fiber moves for summary judgment against all of Aqua Dyne's crossclaims.

First, the Court grants Yankee Fiber's motion against Aqua Dyne's claim for contractual indemnification. Aqua Dyne has failed to present any evidence of a contractual indemnification provision between the two parties; indeed, at oral argument, Aqua Dyne abandoned this claim. (*See* Oral Arg. Tr. at 68.)

Second, the Court denies Yankee Fiber's motion for summary judgment against Aqua Dyne's common law contribution and indemnification claims. "[C]ontribution involves joint tortfeasors whereas indemnification involves vicarious liability." *Durabla Mfg. Co. v. Goodyear Tire and Rubber Co.*, 992 F.Supp. 657, 660 (S.D.N.Y.1998). Yankee Fiber's argument regarding these claims is as follows: "It is hornbook law that claims for common law contribution and indemnification can only be asserted against a party that was at fault. Here, Yankee Fiber has established it was free from any wrong to plaintiff and as such Aqua–Dyne's cross-claim for common law indemnification must be dismissed." (Yankee Fiber's Mem. at 19.)

The Court rejects this argument for substantially the same reasons discussed above regarding plaintiff's failure to warn and negligence claims. There are clearly disputed issues of fact concerning the cause or causes of the pressure fluctu-

ty—for any inherently dangerous or defective product. *Hamilton*, 727 N.Y.S.2d 7, 750

N.E.2d at 1064.

ations that allegedly led to plaintiff's injuries—namely, whether they were a normal part of the water jet's operation, or were the fault of plaintiff, Yankee Fiber, and/or Aqua Dyne. Therefore, at this stage of the case, the Court cannot resolve the questions of whether Aqua Dyne is entitled (1) to contribution as a joint tortfeasor with Yankee Fiber, or (2) to indemnification in the event that Aqua Dyne is "held liable solely on account of the negligence" of Yankee Fiber. *D'Ambrosio v. City of New York,* 55 N.Y.2d 454, 450 N.Y.S.2d 149, 435 N.E.2d 366, 369 (1982) (internal citation omitted).

Accordingly, Yankee Fiber's motion for summary judgment against Aqua Dyne's cross-claims is granted in part and denied in part.

## C. Yankee Fiber's Motion for Summary Judgment on its Cross–Claims Against Aqua Dyne

Finally, Yankee Fiber moves for summary judgment on its common law indemnification claim against Aqua Dyne. Yankee Fiber argues that, in the event that this Court does not dismiss plaintiff's strict liability claim, it should find that Yankee Fiber is entitled, as a matter of law, to indemnification from Aqua Dyne. Specifically, according to Yankee Fiber, "any liability attributed to Yankee Fiber [on a strict products liability theory] would be as a result of an alleged design defect or failure to warn, which would be the responsibility of the manufacturer, Aqua Dyne." (Yankee Fiber's Mem. at 20.)

The Court rejects Yankee Fiber's argument that *any* recovery on plaintiff's strict products liability claim would be recoverable solely from Aqua Dyne. Assuming *arguendo* that plaintiff establishes at trial

that a defect in the water jet or a failure to warn caused his injuries, it is clear that the fact finder would also have to resolved disputed issues of material fact concerning the source of such a defect as well as the cause of the absence of warnings to plaintiff. Specifically, in regard to mechanical defects in the water jet, Aqua Dyne has presented evidence indicating that at least one major component of the water jet—namely, the vacuum pump component—was *not* manufactured by Aqua Dyne but was separately purchased by Yankee Fiber and added to the water jet. (*See* Mallinson Tr. at 40–41.) Moreover, Aqua Dyne has pointed to testimony from each of the parties' respective expert witnesses wherein the respective experts reach a similar conclusion: a loss of vacuum pressure in the water jet may have contributed to plaintiff's injuries. (*See* Tr. of Deposition of Dr. Andrew F. Conn, Aqua Dyne's Expert, at p. 153 ("[P]erhaps the main cause of the . . . accident and this is something that the other experts have agreed to, that there was a loss of vacuum."); Tr. of Deposition of Dr. Archibald Summers, Yankee Fiber's Expert, at 91–92; Tr. of Deposition of Dr. Kamal Youcef Toumi, Adeyinka's Expert, at 59–62, 191–92.) Furthermore, in regard to a failure to warn, there is evidence in the record, recited *supra,* indicating that, while Aqua Dyne provided written safety warnings along with the water jet upon its sale to Yankee Leasing, Yankee Fiber failed to relay such warnings to NYCHA and/or plaintiff.[24]

Therefore, it is clear that, in the event plaintiff recovers on his strict products liability claim or his failure to warn claim, there will remain disputed issues of fact as to whether Yankee Fiber and/or Aqua

---

**24.** In its submissions, Yankee Fiber has failed to address any of these arguments or evidence.

Dyne is liable for plaintiff's losses. Accordingly, the Court denies Yankee Fiber's request for a conditional grant of summary judgment on its indemnification cross-claim.

## IV. CONCLUSION

For the foregoing reasons, Yankee Fiber's motion for summary judgment is granted as to plaintiffs negligent entrustment claim and Aqua Dyne's contractual indemnification claim. Yankee Fiber's motion is denied as to plaintiffs and Aqua Dyne's remaining claims.

SO ORDERED.